TO BE PUBLISHED IN THE OFFICIAL REPORTS

OFFICE OF THE ATTORNEY GENERAL
State of California

JOHN K. VAN DE KAMP
Attorney General

------------------------------
                              :
OPINION                       :
                              :
of                            :    No. 87-106
                              :
JOHN K. VAN DE KAMP  :    <u>JUNE 15, 1988</u>
Attorney General              :
                              :
JACK R. WINKLER               :
Assistant Attorney General    :
                              :
----------------------------------------------------------------


THE HONORABLE TERRY FRIEDMAN, MEMBER OF THE CALIFORNIA ASSEMBLY, has requested an opinion on the following question:

May a home care companion hired to perform services in the employer's home lawfully administer drugs to or engage in nasogastric tube or gastrostomy feeding of the employer when the companion is (a) unlicensed and uncertified, (b) a certified nurse assistant, or (c) a certified home health aide?

CONCLUSIONS

A home care companion hired to perform services in the employer's home, whether certified as a nurse assistant or home health aide or uncertified and unlicensed, may lawfully administer non-prescription drugs but not controlled substances to the employer in the employer's home; and may not lawfully engage in nasogastric tube or gastrostomy feeding of the employer in the employer's home.

ANALYSIS

The request for this opinion is concerned with the scope of activities which may lawfully be performed in the home by unlicensed personnel who are placed as home care companions by a licensed employment agency which is not a licensed home health agency. The request further explained that the employment agency is employer retained which means that the employer pays the agency a fee. The manner in which the home care companion comes in contact

with his or her employer, whether through an agency, by placing an ad in the newspaper, by referral from a friend or by prior acquaintance with the employer, would not affect the scope of services which may be lawfully performed by the companion. For that reason we have not referred to employment agencies or the means by which the employment relation was created in our formulation of the question presented.

The request also indicated that the home care companion would fall into one of three categories: (1) unlicensed, uncertified individuals, (2) certified nurse assistants, or (3) certified home health aides. The first activity of the companion which was of concern in the request is the administration of drugs to the employer in the employer's home. The second activity of concern is the nasogastric tube or gastrostomy feeding of the employer in the employer's home.

The designation of the employee as a "home care companion" in the request indicates that the principal purpose of the employment is to provide companionship for and to attend to the personal needs of the employer. The kinds of tasks performed may vary from case to case depending upon the needs, desires and circumstances of the employer. By way of example, an employer may employ a domestic servant or housekeeper. An employer with an interest in literature whose eyesight is failing may want someone to read to him. Another, with arthritis, may want someone to continue with her extensive correspondence. Another may need assistance in dressing himself. Whether called "maid," "housekeeper," "companion," "secretary," "valet," or something else the significant fact for purposes of this opinion is that the purpose of the employment was not confined to the health care of the employer. We shall refer to such employee as a "companion" whatever the particular non-health care duties of the employee may be.

The words "administration of drugs" as used in the question require some definition. Webster's Third New International Dictionary defines the "administration" of a medicine as "application, dosage." Health and Safety Code (H&S) section 11,002 in the California Uniform Controlled Substances Act provides:

"'Administer' means the direct application of a controlled substance, whether by injection, inhalation, ingestion, or any other means, to the body of a patient for his immediate needs or to the body of a research subject by any of the following:

"(a) A practitioner or, in his presence, by his authorized agent.

"(b) The patient or research subject at the direction and in the presence of the practitioner."

Using these definition we understand the word "administer" in the question to refer to the direct application of a drug into the body of a person. We understand the word "drug" to be

synonymous with medication and both to mean "articles intended for use in the diagnosis, cure, mitigation, treatment or prevention of disease in man." (See § 4031 [1].)

With this understanding of the question we will first examine the laws which regulate the administration of drugs. Next we will apply those laws and any exemptions thereto to the administration of drugs by an unlicensed and uncertified home care companion to an employer in the employer's home. Next we will consider what, if any, additional authority the companion has in this regard if he or she is certified as a nurse assistant or a home health aide. Finally, we will apply these laws to the nasogastric tube or gastronomy feeding of the employer in the employer's home by the companion.

### Legal Restraints on Administration of Drugs.

Since we are asked whether administration of a drug by a home care companion to his or her employer in the employer's home is lawful we look to the constraints placed on such conduct by the law. The first constraint we consider is the California Uniform Controlled Substances Act. The next law we will consider is the Medical Practice Act ("MPA") which prohibits those not licensed as a physician to practice medicine. The final constraint we will examine is that contained in the Nursing Practice Act ("NPA") prohibiting unlicensed persons from practicing nursing.

The California Uniform Controlled Substances Act, section 11,000 et seq. of the Health and Safety Code (H&S) closely regulates many drugs classified therein as controlled substances. The classification of controlled substances is in five schedules. With certain exceptions schedule I drugs such as heroin and marijuana have no legitimate use and their possession is outlawed altogether; Schedule II drugs may be prescribed for legitimate purposes by a physician using state issued triplicate prescription forms; and drugs on Schedules III, IV and V may be prescribed on ordinary prescription forms or transmitted orally by the physician to the pharmacist. The act has many restrictions which must be complied with by practitioners and others.

One of these restrictions is H&S section 11154(a) which provides:

"(a) Except in the regular practice of his or her profession, no person shall knowingly prescribe, administer, dispense, or furnish a controlled substance to or for any person or animal which is not under his or her treatment for a pathology or condition other than addiction to a controlled substance, except as provided in this division [the California Uniform Controlled Substances Act]."

Our review of the California Uniform Controlled Substances Act revealed no exceptions for unlicensed persons (or certified nurse assistants or home health aides). We therefore conclude that a companion may not lawfully administer controlled substances to the employer in the

---

[1]Section references are to the Business and Professions Code unless otherwise indicated.

employer's home.  We have noted above that administer means the direct application of a drug into the body of the person.  Thus H&S section 11154(a) prohibits unlicensed persons from introducing controlled substances into the body.

Furthermore, possession of a controlled substance is made a felony by H&S section 11350 "unless upon the written prescription of a physician, dentist, podiatrist, or veterinarian licensed to practice in this state."  We interpret this clause as removing the possession proscription on a controlled substance which has been lawfully prescribed for a patient by a practitioner from the patient and others whose possession of the drug is consistent with the prescription.  (See People v. Ard (1938) 25 Cal.App.2d 630 and People v. Wallace (1952) 109 Cal.App.2d 676.)  This permits a companion to handle a drug prescribed for his or her employer in ways which are consistent with the prescription short of actual administration of the drug and which do not constitute the practice of medicine or nursing.

H&S section 11154(a), supra, prohibits unlicensed persons from furnishing controlled substances to any person.  H&S section 11016 adopts the definition of "furnish" in section 4048.5 in the Pharmacy Act which reads:  "'Furnish' means to supply by any means, by sale or otherwise."  Section 4049 provides that "'Dispense' means the furnishing of drugs upon a prescription from a physician, dentist, podiatrist or veterinarian."  In the context of the Pharmacy Act we think supply refers to the transaction by which the ownership of drugs is transferred from one person to another as by sale, barter or gift and does not include acquisition and transporting a drug as another's agent.  Thus H&S 11154(a) would not prohibit a companion from acting as his or her employer's agent in having a prescription for a controlled substance issued to the employer filled at a pharmacy and transporting it to and within the employer's home at the employer's request.

Next we consider the limitations placed upon unlicensed and uncertified persons by the  Medical Practice Act. Section 2051 provides:

"The physician's and surgeon's certificate authorizes the holder to use drugs or devices in or upon human beings and to sever or penetrate the tissues of human beings and to use any and all other methods in the treatment of diseases, injuries, deformities, and other physical and mental conditions."

Section 2052 provides:

"Any person who practices or attempts to practice, or who advertises or holds himself or herself out as practicing, any system or mode of treating the sick or afflicted in this state, or who diagnoses, treats, operates for, or prescribes for any ailment, blemish, deformity, disease, disfigurement, disorder, injury, or other physical or mental condition of any person, without having at the time of so doing a valid, unrevoked, or unsuspended certificate [as a licensed physician and surgeon] as provided in this chapter, or without being authorized to perform such act pursuant to a certificate obtained in accordance with some other provision of law, is guilty of a misdemeanor."

Neither of the quoted sections uses the phrase "administration of drugs" as such. Section 2051 authorizes a licensed physician to "use drugs" upon human beings in the "treatment" of diseases.[2] Since section 2052 prohibits those not licensed as physicians from practicing any method of treating the sick or to treat any ailment this prohibits those who are not licensed practitioners from performing those actions concerning drugs which constitute treatment of a patient by means of drugs. We therefore examine what it is that a practitioner does when he or she treats a patient by means of drugs.

Before treating a patient a practitioner must make a diagnosis that there is some illness or condition which needs treatment. If there is the practitioner must then determine the method of treatment. If this includes drugs the practitioner must determine what drug to use and its dosage (including the amounts and times it is to be used) to treat the particular ailment or condition of the patient. These decisions (diagnosis, drug selection and dosage) are reserved to the expertise of the practitioner with but few statutory exceptions.

The methods by which the practitioner's drug decisions are implemented vary with the drug and the circumstances of the patient. If the drug chosen is a prescription drug and the patient is not hospitalized the practitioner would normally write a prescription designating the patient's name, the drug and its dosage and give it to the patient or phone this information to the patient's pharmacist. The patient then goes to the pharmacist who fills the prescription by putting it in a container with a label indicating the patient's name and the directions for its use as indicated in the physician's prescription. The patient then takes the drug home and takes it in accordance with the directions on the label.

If a non-prescription drug is selected by the practitioner as a method of treatment the practitioner advises the patient of the name of the drug and its dosage. The patient then obtains the drug and takes it in accordance with the physician's instructions.

When the patient is hospitalized, instead of writing a prescription the practitioner enters the name of the drug and its dosage on the patient's chart and the drug is given the patient by the nursing staff.

How a practitioner's decisions regarding the treatment of a patient by means of drugs are carried out frequently involves the actions of others. These implementing actions, while part of the treatment program are not reserved exclusively to the practitioner. The MPA and other practice acts contemplate that such implementing actions may be delegated to others. When a pharmacist, a nurse, the patient or others act to implement the practitioner's drug decisions they do not practice

---

[2]Dentists (see § 1625 defining dentistry) and podiatrists (see § 2472 defining podiatric medicine) are also authorized to treat specific ailments in humans by means of drugs and for that reason we use the term "practitioner" to refer to all those licensed to treat humans by means of drugs.

medicine (or dentistry) or violate the MPA.  Instead they are implementing the practice of the practitioner who made the decisions to treat the patient by means of drugs.

We have defined the administration of drugs to mean the direct application of a drug into the body of a person.  This is the last act in implementing a treatment by means of drugs.  It must be distinguished from other preliminary actions including, diagnosis, drug selection, dosage determinations, prescriptions, orders or advice from the practitioner, and acquisition and transportation of the drug.

We conclude that it is the diagnosis, the decision to use a particular drug and its dosage and the prescription or order for a controlled substance or advice to use a non-prescription drug and its dosage that unlicensed persons are prohibited from doing by section 2052. (We will consider some exemptions to § 2052 later when we discuss its application to the administration of drugs by a companion to his or her employer in the employer's home.)  That section does not prohibit actions implementing the practitioners drug determinations by others.  Instead the MPA contemplates that such actions will often be done by the patient and others.  This includes administration of a drug into the body of the patient.

We now consider the constraints placed upon the administration of drugs by unlicensed and uncertified persons by the Nursing Practice Act.  Section 2732 provides in part:

"No person shall engage in the practice of nursing, as defined in Section 2725, without holding a license which is in active status issued under this chapter [the NPA consisting of §§ 2700 through 2897.5] except as otherwise provided in this act."

Section 2795 provides:

"Except as provided in this chapter it is unlawful for any person to practice or to offer to practice nursing in this state unless such person holds a license in an active status, or to use any title, sign, card or device to indicate that he or she is qualified to practice or is practicing nursing, unless such person has been duly licensed or certified under this chapter."

Section 2725 provides in part:

". . . . . . . . . . . . . . . . . . . . . . .

"The practice of nursing within the meaning of this chapter means those functions, including basic health care, which help people cope with difficulties in daily living which are associated with their actual or potential health or illness problems or the treatment thereof which require a substantial amount of scientific knowledge or technical skill, and includes all of the following:

". . . . . . . . . . . . . . . . . . . .

"(b) Direct and indirect patient care services, including, but not limited to, the administration of medications and therapeutic agents, necessary to implement a treatment, disease prevention, or rehabilitative regimen ordered by and within the scope of licensure of a physician, dentist, podiatrist, or clinical psychologist, as defined by Section 1316.5 of the Health and Safety Code.

". . . . . . . . . . . . . . . . . . . . ."

We will consider this definition of nursing and some exemptions to the NPA later when we discuss its application to the administration of drugs by a companion to his or her employer in the employer's home.

### Lay Administration of Drugs in Employer's Home.

The question asks whether an unlicensed and uncertified person hired as a home care companion may lawfully administer drugs to the employer in the employer's home. With the legal restraints on the administration of drugs in mind we turn now to their application to the administration of drugs to the employer in the employer's home.

If the drug to be used is a controlled substance then all of the requirements of the California Uniform Controlled Substances Act must be followed. There must be a prescription for the drug issued for the employer patient and the companion's possession of that drug must be consistent with the prescription. The employer may ask the companion to have the prescription filled at the pharmacy, or to get the drug at the pharmacy when the prescription was phoned in. In our view the companion's compliance with such requests would be lawful. Similarly the companion may lawfully comply with the employer's request to bring the drug from its place of storage in the medicine cabinet or elsewhere to the employer and count out the number of pills indicated in the dosage instructions on the container and put them in the employer's hand. The possession of the drug by the companion in such cases would be consistent with the prescription and thus lawful within the prescription exception in H&S section 11,350. The companion may not administer the controlled substance by introducing it into the body of the employer since this is prohibited by H&S section 11154(a).

There are many drugs such as aspirin, which are not controlled substances, which may be lawfully acquired and possessed by anyone without a prescription. As to these "non-prescription" drugs our concern is not with the possession of the drug by the companion but whether what the companion does with it constitutes the practice of medicine or the practice of nursing. In deciding those questions it doesn't matter whether the drug is a controlled substance or a non-prescription drug. We examine those practice questions now.

We noted that the Medical Practice Act prohibits all except licensed practitioners from making a diagnosis or selecting a drug and determining the dosage to use in treating humans.

This prohibits the companion from taking any part in the diagnosis of the employer's illness or condition or in the selection of the drug to use or its dosage to treat the employer's illness or condition by advice or otherwise. This applies to non-prescription drugs as well as controlled substances. But the MPA does not prohibit the companion from other acts which involve drugs, such as acquisition, transportation and administration of the drug for his or her employer.

While a literal reading of section 2052 would appear to prohibit self diagnosis and treatment, ("Any person who . . . diagnoses, treats, . . . any ailment, . . . of any person,") we concluded in 62 Ops.Cal.Atty.Gen. 792, 795-796 (1979), based on an examination of the successive Medical Practice Acts since 1876, that the MPA was never intended to proscribe self-diagnosis and self-treatment. We adhere to that opinion. Thus the MPA does not prohibit the employer from diagnosing his or her own condition or from treating himself or herself by means of drugs. We frequently diagnose and treat ourselves for colds, headaches and the like with aspirin and other non-prescription drugs.

Of course the employer's self-treatment would not extend to controlled substances because the California Uniform Controlled Substances Act requires a prescription for such drugs and that act authorizes only licensed practitioners to prescribe such drugs. However, with respect to non-prescription drugs, if the employer, without any advice or other assistance from the companion, makes a self-diagnosis and decides to treat himself or herself with a particular non-prescription drug, the MPA would not prohibit the companion from the acquisition and transportation of the drug on the employer's request any more than would be the case if such treatment had been advised by a licensed practitioner. Neither would the MPA prohibit the administration of a non-prescription drug by the companion to his or her employer. Of course, the companion may not take any part, by advice or otherwise, in the employer's diagnosis of his or her condition or in his or her decision to treat the condition with a particular drug or the dosage to use because the making of such decisions for others constitutes treatment of others by means of drugs which only licensed practitioners may do.

Next we consider the application of the Nurses Practice Act to the administration of drugs by the companion to his or her employer in the employer's home. First, we note that section 2795, supra, prohibits not only the practice of nursing by unlicensed and uncertified persons, but also prohibits such persons from offering to practice nursing or "to use any title, sign, card or device to indicate that he or she is qualified to practice or is practicing nursing." This language would prohibit an unlicensed and uncertified companion from advertising or otherwise holding himself or herself out to be a nurse or qualified to practice nursing to secure employment or that his or her employment was the practice of nursing. This would include the use of the word "nurse" or "nursing" in advertisements or business cards and the like and the wearing of a nurse's uniform in his or her employment.

Participation in the administration of drugs to one's employer in the employer's home would be a function which helps the employer cope with difficulties in daily living which are associated with his or her health or illness problems or the treatment thereof as these terms are used in the statutory definition of the practice of nursing. However, these words are qualified by the

clause: "which require a substantial amount of scientific knowledge or technical skill." This would normally require an examination of the particular act in question to determine the amount of scientific knowledge and technical skill required to perform it in order to determine whether performance of the act constituted the practice of nursing and thus required certification under the NPA.

The statutory definition is not that simple however. It adds that the definition includes, among other things, patient care services including the administration of medications and therapeutic agents, necessary to implement a treatment regimen ordered by a physician. We believe the purpose of subdivision (b) in section 2725 was not to add conduct which did not require a substantial amount of scientific knowledge or technical skill into the definition of the practice of nursing but to assure that the actions which introduce medications and therapeutic agents into the body of a patient which do require a substantial amount of scientific knowledge or technical skill, such as injections by hypodermic syringe, were included in the definition of the practice of nursing.

Drugs may be administered into humans in several ways, including swallowing, injection by hypodermic syringe into blood vessels, muscles or under the skin, inhaling drugs in gaseous form, insertion in body cavities such as the nose, eyes, ears or rectum, or transfusion through skin surfaces. We consider only the first two in this opinion. Pills, tablets, capsules, or drugs in other solid or liquid forms taken orally into the digestive tract would appear to be administered by the patient's act of swallowing. A companion's actions in making such drugs more readily accessible to swallowing by the employer would not involve any substantial amount of scientific knowledge or technical skill. On the other hand injection by hypodermic syringe into a blood vessel, muscle or under the skin would appear to require a substantial amount of scientific knowledge and technical skill. We are bolstered in this conclusion by title 22, Code of Federal Regulation, section 409.33(b) governing Medicare eligibility for nursing services providing that "intravenous, intramuscular, or subcutaneous injections" are services that qualify as skilled nursing services.

We conclude that the NPA does not prohibit an unlicensed or uncertified companion from the administration of drugs to an employer in the employer's home in ways which do not require substantial scientific knowledge or technical skill. This would include the acquisition of the drug and its transportation to places where it is more readily usable by the employer. On the other hand unlicensed and uncertified persons may not lawfully perform functions which require substantial scientific knowledge or technical skill, such as hypodermic injections, unless they come within an exception to the NPA.

Next we consider the statutory exemptions from the Medical Practice Act and the Nurses Practice Act and their application to the question presented. Section 2058 provides: "Nothing in this chapter [the MPA] prohibits . . . the domestic administration of family remedies." Similarly section 2727 provides: "This chapter does not prohibit: . . . (c) Domestic administration of family remedies by any person." The exception was included in the MPA of 1913 (ch. 354, § 22, Stats. 1913) and in the NPA in 1939 (ch. 807, § 2, Stats. 1939). We believe the Legislature intended "domestic administration of family remedies" to have the same meaning in both exceptions. Words

or phrases in a statutory provision that were used in a prior act or closely related act pertaining to the same subject will usually be construed to be used in the same sense. (Estate of Hoertkorn (1979) 88 Cal.App.3d 461, 465-466.)

In 62 Ops.Cal.Atty.Gen. 792, 796 (1979) we concluded that the words "family remedies" were intended to include all those preparations which may lawfully be purchased without a prescription. In the same opinion we concluded that the words "domestic administration" referred to the domestic environment of a household or family which the Legislature intended to distinguish from clinical environments such as hospitals, doctor's offices, clinics and other places where medical services are regularly provided by persons not in the family. We reaffirm those conclusions in this opinion.

On pages 796-797 of 62 Ops.Cal.Atty.Gen. 792, supra, we suggested that the domestic administration of family remedies exception applied only to members of the family. The wording of the exception simply does not support this limitation. The word "family" modifies the word "remedies" and not the word "administration." The exception requires that the "administration" of family remedies be "domestic," that is, by someone in the household. The word "domestic" is used by the Legislature in the same section (§ 2727(b) of the NPA) to create another exception for incidental care of the sick by "domestic servants." This includes those employed in the household as servants who are not members of the family of the employer. Where a word is used repeatedly in a statute, it will be presumed that it was used in the same sense throughout in the absence of anything in the statute to the contrary. (Corey v. Knight (1957) 150 Cal.App.2d 671, 680.) Thus we conclude that the domestic application of family remedies exception applies to those employed in the home as well as to family members of the household. Any suggestion to the contrary in 62 Ops.Cal.Atty.Gen. 792 is disapproved.

We conclude that a home care companion may administer non-prescription drugs to his or her employer in the employer's home under the domestic administration of family remedies exceptions in the MPA and NPA. However, it must be emphasized that this exception extends only to the "administration" of non-prescription drugs in the domestic environment. It does not authorize a companion to participate, by advice or otherwise, in the diagnosis or decisions regarding the drug to use or its dosage made by the employer or his or her physician. Nor does it authorize the companion to administer controlled substances of any kind.

Section 2727(b) in the Nursing Practice Act provides that the act does not prohibit "incidental care of the sick by domestic servants or by persons primarily employed as housekeepers as long as they do not practice nursing within the meaning of" the NPA. Since the companion in the question may have been employed primarily as a domestic servant or housekeeper we must consider the application of subdivision (b) to such a companion.

We have found no cases or opinions which construe the section 2727(b) exception to the NPA. Its language is somewhat confusing. If the "incidental care of the sick" it speaks of means the same as the practice of nursing the "as long as" limitation is as broad as the exception making it meaningless. To give the exception some meaning we construe "incidental care of the

sick" to mean any care that a domestic servant or housekeeper might give a sick person in the home of his or her employer. The "as long as" clause limits the exception to that care of the sick which does not come within the NPA's definition of the practice of nursing, i.e., those activities which do not require a substantial amount of scientific knowledge or technical skill. The section 2727(b) exception was first enacted in 1939 (ch. 807, Stats. 1939) at the same time that the practice of nursing was first defined by the same statute to mean "the performing of professional services requiring technical skills and specific knowledge based on the principles of scientific medicine." We believe the Legislature intended the exception to assure that the unskilled care being rendered sick people in the home by domestic servants and housekeepers could continue as before but that those services which required technical skills and scientific knowledge could only be provided by licensed nurses.

The section 2727(b) exception to the NPA does not affect the authority of a companion to administer drugs to the employer in the employer's home. The companion, whether employed as a domestic servant, housekeeper, or in some other capacity to work in the employer's home may do those acts with respect to the administration of drugs which do not involve diagnosing the employer's condition or selecting the drug or its dosage for use by the employers since these functions are reserved to licensed practitioners by the MPA. Such companions may administer non-prescription drugs to the employer in the employer's home under the domestic administration of family remedies exception to the MPA and the NPA. Of course the administration of controlled substances by unlicensed persons is prohibited by the California Uniform Controlled Substances Act.

We conclude that an unlicensed and uncertified home care companion may lawfully administer non-prescription drugs (under the domestic administration of family remedies exemption) but not controlled substances to the employer in the employer's home.

Certification as a Nurse Assistant or Home Health Aide

Health and Safety Code section 1337(b)(3) provides:

"'Certified nurse assistant' means any person who holds himself or herself out as a certified nurse assistant and who, for compensation, performs basic patient care services directed at the safety, comfort, personal hygiene, and protection of patients, and is certified as having completed the requirements of this article. These services shall not include any services which may only be performed by a licensed person and otherwise shall be performed under the supervision of a registered nurse, as defined in Section 2725 of the Business and Professions Code, or a licensed vocational nurse, as defined in Section 2859 of the Business and Professions Code."

While H&S section 1337 indicates that direct patient care in skilled nursing and intermediate care facilities is currently rendered largely by certified nurse assistants we see nothing in the statutes which confine certified nurse assistants to those facilities. We find nothing in H&S section 1337 et seq. which would prevent a certified nurse assistant from providing the patient care

services authorized by H&S section 1337 to an employer in the employer's home if they are performed under the supervision of a registered nurse or licensed vocational nurse.

With respect to the administration of drugs to the employer in the employer's home however, we have found nothing in the statutes governing certified nurse assistants or in the regulations implementing them which authorizes the certified nurse assistant to assist in the administration of drugs which may not be performed by an uncertified and unlicensed person. H&S section 1337 expressly prohibits a certified nurse assistant from performing any service which may only be performed by a licensed person, i.e., by a licensed physician, registered nurse or licensed vocational nurse. As we have seen the diagnosis, drug selection and dosage determinations may only be performed by a licensed practitioner. Those actions involving drugs which require substantial scientific knowledge or technical skill are within the definition of the practice of nursing and therefore may only be performed by licensed nurses unless they some within some exception to the NPA. As we have indicated an unlicensed and uncertified home care companion would come within certain of those exceptions. However, we have not found any authority for a certified nurse assistant to act with respect to drugs in his or her employer's home in a manner which exceeds that of an unlicensed and uncertified companion.

Chapter 8, division 2 of the Health and Safety Code (§ 1725 et seq.) regulates home health agencies. The pertinent provisions of H&S section 1725, 1726, 1727 and 1734 are quoted in the Appendix.

The employment of a home care companion by an employer to provide services to the employer in the employer's home would not appear to fit the statutory definition of a home health agency. (See H&S § 1727(b) in Appendix.) The companion is neither a public agency nor a private organization which has policies, established by a group of professional personnel, including one or more physicians. Thus the companion would not violate section 1726 by providing services to the employer in the employer's home.

Unlike H&S section 1337 et seq. providing for the certification of "certified nurse assistants," we find nothing in H&S section 1725 et seq. providing for the certification of a "certified home health aide." However, we do find in title 22, California Code of Regulations, section 74745 which provides:

"(a) Home health aides shall be certified by the Department. To qualify for certification the following shall be met:

"(1) Completion of a Department approved training program as outlined in Section 74747 or its equivalent.

"(2) Submission by the home health agency to the Department of satisfactory evidence of completion of an equivalent home health aide training program on forms furnished by the Department. The Department may certify the home health aide as

meeting the equivalent training requirement and shall maintain records on the aides certified through this method."

We assume, without deciding, that this regulation is authorized by H&S section 1734, supra. (See Appendix.)  However, since the regulation was promulgated to implement section 1727 its significance is limited  to those employed by a home health agency to provide home health aide services as those terms are defined in section 1727.  The regulation requires such aides to be certified when they are employed by a home health agency.  However, certification is not required when such an aide is employed directly by an employer to provide services to the employer in the employer's home without the involvement of a home health agency.  In such case the certification provides the aide with no more authority to provide services than he or she would have without such certification.

We conclude that a certified nurse assistant and a certified home health aide has no more authority to administer drugs to his or her employer in the employer's home than an unlicensed and uncertified person.

### Nasogastric Tube or Gastrostomy Feeding

Gastric tube and gastrostomy feeding are procedures which enable a person who cannot eat normally due to loss of function in all or part of the upper digestive system (mouth, throat, esophagus) to receive nutrients by means of a tube that bypasses the disfunctioning structures.

In nasogastric tube feeding the tube is inserted through the nostrils to the stomach via the esophagus.  Aside from the possible tissue trauma that may occur when the tube is initially inserted, possibility exists that in the course of insertion the tube may slide into the trachea and then enter the lungs.  Should that occur and feeding be commenced, the patient will experience severe respiratory distress due to fluid aspiration.  Thus once a tube is inserted, proper placement must be confirmed either by gently injecting air through it with a syringe and stethoscopically listening for the terminus position, or by gently aspirating stomach contents with a syringe.  The tube is then secured with tape and feeding commences with a syringe or via a feeding bag.

The patient must not be in a supine position to prevent aspiration by gastro-esophageal reflex, and the feeding must be gentle with the nutrient-liquid draining slowly to the stomach by gravity.  Even during feeding, aspiration may occur.  Imprecise gastric placement may allow fluid to accumulate, and since the nasogastric tube passes through both upper and lower esophageal sphincters, they are rendered incompetent and thus provide an easy route for liquid to travel. (Cecil, Textbook of Medicine, (Wyngarden & Smith eds., 16th ed. 1982) at p. 1437.)  "Yet appreciable aspiration resulting from use of a nasogastric tube does not occur very often, undoubtedly because of skillful nursing care."  (Ibid.; emphasis added.)

With gastrostomy feeding, a surgical opening into the stomach is made which allows a tube to be inserted in the stomach through the abdominal and stomach walls.  This allows food and fluid to be instilled directly into the stomach from outside the body when swallowing is

impossible because of complete obstruction of the esophagus. It is also sometimes used temporarily after operations on the esophagus or for postoperative decompression in preference to nasogastric intubation. (The Bantam Medical Dictionary (Bantam ed. 1982) at p. 170; Stedman's Medical Dictionary (5th Unab. Lawyers' Ed. 1982) at p. 578.) During gastrostomy feeding the patient must be upright lest the danger of aspiration or regurgitation occur. Precaution is required in handling the gastrostomy tube which has been either fastened in place with sutures or has been anchored in place with tape depending on the type of gastrostomy tube used, a small-diameter rubber, perforated tube or a Foley catheter.

With the gastrostomy feeding itself, one first instills a clear liquid to make sure the tube is open and, again, feeding is gentle using gravity or slow infusion. At all times the tube must be kept open, for should it become clogged or blocked, or accidentally removed, further intervention will be necessary to replace it. The task of feeding is not in itself particularly difficult, but it does require a studied knowledge and understanding of the principles involved, an ability to recognize signs of potential complication, and an appreciation for the potential for yet another intervention on the weakened patient.

We are persuaded by our understanding of these procedures that substantial scientific knowledge and technical skill are necessary to their proper performance. We are bolstered in this assessment by title 42, Code of Federal Regulations, section 409.33(b) governing Medicare eligibility for payments for skilled nursing services listing "Levin tube and gastrostomy feedings" as services which qualify as skilled nursing services. Stedman's Medical Dictionary, 5th ed., defines Levin tube as a tube introduced through the nose into the upper alimentary canal. Accordingly these procedures come within the statutory definition of the practice of nursing and therefore may only be performed in California by licensed nurses and practitioners.

We conclude that a home care companion hired to perform services in the employer's home may not engage in nasogastric tube or gastrostomy feeding of the employer when the companion is unlicensed and uncertified or when the companion is a certified nurse assistant or a certified home health aide.

\* \* \* \* \*

14. 87-106

APPENDIX

Health & Safety Code section 1725 provides:

"It is the purpose of this chapter to license home health agencies in order to permit certain agencies to meet the requirements of federal law as provided in Public Law 89-97, the Social Security Amendments of 1965. By passing a licensing act it is the intent of the Legislature to allow all those who are qualified to provide home health services to the people of California. It is the further intent that the State Department of Health Services shall establish high standards of quality for home health agencies which provide such services."

H&S section 1726 provides in part:

"No person, private or public organization, political subdivision of the state, or other governmental agency within the state, shall establish, conduct, or maintain in this state any home health agency without first obtaining a license therefor or being approved by the state department as provided in this chapter. . . ."

H&S section 1727 provides:

"As used in this chapter, the following terms have the meanings set forth in this section:

"(a) 'State department' means the State Department of Health Services.

"(b) 'Home health agency' means a public agency or private organization, or a subdivision of any such agency or organization, which --

"(1) Is primarily engaged in providing skilled nursing services and other therapeutic services to patients in the home on a part-time or intermittent basis, or, for the sole purpose of providing in-home medical services pursuant to subdivision (t) of Section 14132 of the Welfare and Institutions Code, on any basis, including but not limited to a licensed hospital, sanatorium, nursing or convalescent home or local health department which incidentally to its primary function provides health services in the home environment;

"(2) Has policies, established by a group of professional personnel, including one or more physicians and one or more public health nurses as certified by the state department pursuant to Section 600 of this code, to govern the services which it provides, and provides for supervision of such services by a physician or registered nurse, provided that skilled nursing services shall be supervised by a registered nurse. Such policies shall be written and include, but not be limited to, those

15.                                                                                    87-106

concerning patient care, personnel, training and indoctrination, supervision and program evaluation;

"(3) Maintains clinical records on all patients, including a plan of treatment prescribed by the patient's physician; and

"(4) Meets such other standards, rules and regulations adopted by the state department.

"(c) 'Skilled nursing services' means those services ordinarily provided by a registered nurse or licensed vocational nurse in the home environment to patients under a plan of treatment prescribed by the patient's physician who is licensed to practice medicine in the state.

"(d) 'Other therapeutic services' includes but is not limited to physical, speech or occupational therapy; medical social services; and home health aide services.

"(e) 'Home health aide services' means those services ordinarily provided by an unlicensed person, including a practical nurse, who is employed by a home health agency to provide supportive services to the patient in the home under the supervision of a registered nurse or a physical, speech, or occupational therapist."

H&S section 1734 provides in part:

"The state department shall make and promulgate, and may thereafter modify, amend, or rescind, reasonable rules and regulations to carry out the purposes of this chapter, including, the prohibition of specific conduct, determined by the state department to be, inimical to the public health, morals, welfare or safety of the people of the State of California in the maintenance and operation of the home health agency for which a license is issued. . . ."